## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **LINDA L. ALLEN, DONALD L. ENGLE, JR., JOHN W. MCCORMICK, and BETTY L. PUTHOFF, Individually and on Behalf of the ESTATE OF NICHOLAS A. PUTHOFF,** | ) ) ) ) ) | **Case No: 1:20-cv-00011**<br><br>**Hon.** |
| **Plaintiffs,** | ) ) | **COMPLAINT** |
| **vs.** | ) ) ) | |
| **HORTER INVESTMENT MANAGEMENT, LLC,** | ) ) ) | |
| **Defendant.** | ) ) | |
| _____ | ) | |

Plaintiffs Linda L. Allen ("Allen"), Donald L. Engle, Jr. ("Engle"), John W. McCormick ("McCormick"), and Betty L. Puthoff ("B. Puthoff"), Individually and on Behalf of the Estate of Nicholas A. Puthoff ("N. Puthoff") (the "Puthoffs"), hereby sue Defendant Horter Investment Management, LLC ("Horter"), and allege:

### PARTIES

1.      Allen, Engle, and B. Puthoff are Ohio citizens. Allen is a resident of Auglaize County, Engle is a resident of Montgomery County, and B. Puthoff is a resident of Mercer County. McCormick is a resident of Austin, Texas.

2.      Defendant Horter is an Ohio limited liability company with its principal place of business in Cincinnati. Horter is registered as an investment adviser with the Securities and Exchange Commission.

3.      Jeffrey L. Wendel ("Wendel") was a registered investment adviser representative for Horter and was responsible for handling Allen's, Engle's, and the Puthoffs' accounts with Horter.

Wendel was headquartered at a Horter office in Fort Recovery, Ohio, in Mercer County ("Fort Recovery office"), and also had an office in Englewood, Ohio, in Montgomery County ("Englewood office").

4.     Carl G. Noble ("Noble") was a registered investment adviser representative for Horter and was responsible for handling McCormick's accounts with Horter. Noble was located at a Horter office in Austin, Texas ("Austin office").

5.     All of the Plaintiffs had client agreements with Horter. Exh. 1. Allen, Engle, and the Puthoffs knew that Wendel was a representative of Horter, and McCormick knew that Noble was a representative of Horter. Exh. 1. Horter is responsible for Wendel's and Noble's actions alleged herein under principles of agency and apparent agency, *respondeat superior*, licensing, supervision, and controlling person liability.

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction under 28 U.S.C. § 1331, because Plaintiffs have brought claims in this Court against Horter for violations of the Investment Advisers Act, 15 U.S.C. 80b-6 and 80b-15(b), and the federal securities laws, 15 U.S.C. §§ 77l(1), 77o; 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. In addition, the underlying arbitration Statement of Claims against Horter contains these claims that arise under federal law. See Vaden v. Discover Bank, 556 U.S. 49 (2009). This Court has supplemental jurisdiction under 28 U.S.C. 1367(a) over the remaining claims.

7.     Venue is proper in this District, because Horter is headquartered in Cincinnati in this District.

2

## INVESTMENTS AT ISSUE

8.      From Wendel's Fort Recovery and Englewood offices, while he worked for Horter, Wendel recommended and sold to Allen, Engle, and the Puthoffs the following investments in Woodbridge Mortgage Investment Fund 2, LLC ("Woodbridge"), 1st Global Capital, LLC ("1st Global"), and Wendel Alternative Fund, LLC ("Wendel Alternative Fund"). From Noble's Austin office, while he worked for Horter, Noble recommended and sold to McCormick the following investment in Future Income Payments, LLC ("FIP"):

| PLAINTIFFS | DATE | INVESTMENT | AMOUNT |
|---|---|---|---|
| Allen | 8/24/16 | 1st Global | $75,000.00 |
| Allen | 9/2/16 | 1st Global | $25,000.00 |
| Engle | 10/24/16 | Woodbridge | $200,000.00 |
| Engle | 10/26/16 | 1st Global | $300,000.00 |
| Engle | 10/26/16 | Wendel Alternative Fund | $39,510.68 |
| McCormick | 6/3/16 | FIP | $260,000.00 |
| B. Puthoff | 10/25/16 | 1st Global | $221,500.00 |
| N. Puthoff | 10/25/16 | 1st Global | $128,500.00 |
| | | **TOTAL**: | $1,249,510.68 |

## FALSE RECOMMENDATIONS AND REPRESENTATIONS
## AND MATERIAL OMISSIONS

### A.      General Allegations

9.      The recommendations, representations, and omissions alleged herein were intentional or were reckless because they were highly unreasonable conduct that constituted an extreme departure from the standards of ordinary care. Horter, acting through Wendel and Noble, had a duty to conduct a proper due diligence investigation for Woodbridge, 1st Global, Wendel Alternative

Fund, and FIP, and a duty to have an adequate and reasonable basis for recommending that the Plaintiffs purchase these securities. Horter, acting through Wendel and Noble, intentionally or recklessly did not adequately investigate Woodbridge, 1st Global, Wendel Alternative Fund, and FIP before recommending these securities to the Plaintiffs.

10.     Horter's recommendations and representations, acting through Wendel and Noble, were misleading because Wendel and Noble intentionally or recklessly recommended and represented that Woodbridge, 1st Global, Wendel Alternative Fund, and FIP satisfied the Plaintiffs' investment objectives and were good investments for the Plaintiffs to buy, when in fact they did not satisfy the Plaintiffs' investment objectives and were not good investments for the Plaintiffs to buy. Horter's omissions, acting through Wendel and Noble, were materially misleading because truthful and complete representations would have shown that the investments did not satisfy the Plaintiffs' investment objectives and were not good investments to buy. Horter, acting through Wendel and Noble, intentionally or recklessly did not disclose that Woodbridge, 1st Global, Wendel Alternative Fund, and FIP were securities being sold in violation of state and federal securities registration requirements and that Horter was not supervising Wendel and Noble when they sold these securities.

11.     Horter, acting through Wendel and Noble, had a duty to disclose the complete truth, because Wendel's and Noble's other representations were inaccurate, incomplete, and misleading, and Horter, acting through Wendel and Noble, knew that Plaintiffs were relying on these representations. Horter, acting through Wendel and Noble, also had a duty to disclose, because Horter was an investment adviser, Wendel and Noble were investment adviser representatives, the Plaintiffs trusted them, and they were fiduciaries to the Plaintiffs.

12.     Plaintiffs relied on Horter and on Wendel's and Noble's recommendations, representations, and omissions alleged herein in making their investments in Woodbridge, 1st Global, Wendel Alternative Fund, and FIP. They would not have made these investments without these recommendations, representations, and omissions. Plaintiffs suffered losses as a result.

13.     The recommendations, representations, and omissions had causal connections to the Plaintiffs' losses, because the recommendations, representations, and omissions concealed the risks of the Woodbridge, 1st Global, Wendel Alternative Fund, and FIP. The risks concealed were the risks that materialized. Horter, acting through Wendel and Noble, could readily foresee that recommending unsuitable and fraudulent investments to the Plaintiffs would result in losses.

**B.     <u>Woodbridge</u>**

14.     On or about October 24, 2016, Horter, acting through Wendel, failed to disclose to Engle the following material facts about Woodbridge, among others:[1]

    i)     Woodbridge was a massive Ponzi scheme. New investor money was used to pay the returns owed to existing investors.

    ii)     Woodbridge's business model was a sham. Nearly all of the purported third-party borrowers were actually limited liability companies owned and controlled by Woodbridge, which had no revenue, no bank accounts, and never paid any interest under the loans.

    iii)     Rather than issue loans to unaffiliated third-party borrowers in arms-length transactions, Woodbridge used investor funds to purchase almost 200 residential and commercial properties located primarily in Los Angeles, California and Aspen, Colorado, and placed title to those properties in the name of LLCs affiliated with Woodbridge's owner and President.

    iv)     Many of the properties Woodbridge purchased remained as vacant lots that sat undeveloped for several years.

---

[1]     The locations of the omissions described in paragraphs 14 and 16-18 of this Complaint are described in more detail in paragraphs 19-27 of this Complaint.

v)      Woodbridge and Woodbridge's owner and President, Robert H. Shapiro misused and misappropriated hundreds of millions of dollars that Woodbridge investors entrusted to them.

vi)      Woodbridge was being sold in violation of federal and state securities registration and disclosure laws.

vii)      Horter was not reasonably supervising Wendel when he recommended that Engle purchase Woodbridge.

Exh. 2 and 3.

15.      According to the Securities and Exchange Commission, Wendel sold approximately $25 million in Woodbridge securities to 750 investors in four states and made approximately $1.7 million in sales commissions. Exh. 3, ¶ 52.

**C.      1st Global**

16.      1st Global purported to use investor monies to make short-term cash advances called Merchant Cash Advances ("MCAs") to businesses that could not obtain more traditional financing such as bank loans. On or about the dates alleged in paragraph 8 of this Complaint, Horter, acting through Wendel, failed to disclose to the Plaintiffs who purchased 1st Global the following material facts, among others:

i)      1st Global used substantial investor funds for purposes other than short-term cash advances, including paying operating expenses and purchasing already-distressed, long-term credit card debt.

ii)      1st Global and 1st Global's Chairman and Chief Executive Officer, Carl C. Ruderman ("Ruderman"), misappropriated at least $35 million of investor money, at least $28 million of which was paid: (1) directly to Ruderman, to the Ruderman Family Trust, and to other entities he owned or controlled; (2) to companies owned or operated by Ruderman's relatives and acquaintances with no connection to 1st Global's cash advance business; and (3) to fund Ruderman's lavish expenses such as a luxury vacation to Greece and monthly payments for his Mercedes Benz.

iii)    1st Global often made loans of hundreds of thousands or even millions of dollars. In one instance, 1 Global made an MCA of approximately $40 million to a single California automobile dealership.

iv)    1st Global had substantial difficulty collecting from merchants. In 2016, 210 of the approximately 1,166 MCAs (18%) were the subject of collection lawsuits. In 2017, 328 of 1 Global's 2092 MCAs (15%) were the subject of collection lawsuits.

v)    1st Global was being sold in violation of federal and state securities registration and disclosure laws.

vi)    Horter was not reasonably supervising Wendel when he recommended that the Plaintiffs purchase 1st Global securities.

Exh. 4.

### D.    **Wendel Alternative Fund**

17.    On or about October 26, 2016, Horter, acting through Wendel, represented to Engle that Wendel Alternative Fund purchased used life insurance policies (portions or the entire amount) and the buyer became the beneficiary. Horter, acting through Wendel, failed to disclose to Engle that this investment was being sold in violation of federal and state securities registration and disclosure laws and that Horter was not reasonably supervising Wendel when he recommended that Engle purchase the Wendel Alternative Fund security.

### E.    **FIP**

18.    On or about June 3, 2016, Horter, acting through Noble, failed to disclose to McCormick the following material facts concerning FIP, among others:

i)    FIP claimed to purchase the right to receive over time one or more income payments comprised of fixed, predetermined payments at a specific discount rate from an individual entitled to such payments. This "cash flow" was sold to investors. FIP, however, did not purchase income streams from the owners and

instead lent money to them. FIP was an unlicensed lender and charged usurious interest rates.

ii)      FIP was run by Scott A. Kohn ("Kohn"), a convicted felon. Kohn pleaded guilty to trafficking in counterfeit goods in 2006 and served 15 months in federal prison.

iii)      FIP was formed in 2011. FIP's mailing address was a mailbox at a United Parcel Service Inc. store in a strip mall outside Las Vegas, Nevada. The same address was used by Kohn for dozens of other companies, most of them now defunct.

iv)      FIP targeted pension holders who were veterans of the United States Armed Forces in violation of federal law.

vi)      FIP was being sold in violation of federal and state securities registration and disclosure laws.

vii)      Horter was not reasonably supervising Noble when he recommended that McCormick purchase FIP.

Exh. 5.

### E.      Allen

19.      Allen is more than 55 years old and works as a production operator for a yogurt company. She told Wendel she wanted safe investments that would produce a supplemental income for her retirement.

20.      On or about the dates alleged in paragraph 8 of this Complaint, at Wendel's Fort Recovery office, Horter, acting through Wendel, falsely represented to Allen that 1st Global was safe and satisfied those investment objectives. Horter, acting through Wendel, falsely represented and recommended that 1st Global was a good investment for Allen to buy, but this investment was in fact unsuitable for Allen in light of her investment objectives and knowledge and financial situation and needs.

**F.**   **Engel**

21.   Engle is more than 60 years old, has only a high school degree, and worked for an engineering consulting firm before retiring in 2018. He told Wendel he wanted safe, secure, and reliable income.

22.   On or about the dates alleged in paragraph 8 of this Complaint, at Wendel's Englewood office, Horter, acting through Wendel, falsely represented to Engle that Woodbridge, 1st Global, and Wendel Alternative Fund satisfied those investment objectives. Horter, acting through Wendel, falsely represented and recommended that Woodbridge, 1st Global, and Wendel Alternative Fund were good investments for Engle to buy, but these investments were in fact unsuitable for Engle in light of his investment objectives and knowledge and financial situation and needs

23.   Engle opened an IRA account with Horter and Wendel in April 2015, and transferred almost all of the funds in his 401k account to Horter. During the period between April 2015 and October 2016, Horter charged Engle inflated management fees and improperly placed him in high risk investments. Engle lost $56,568.62 of his investment principal, and was charged $24,233.71 in management fees.

**G.**   **McCormick**

24.   McCormick is more than 65 years old and is an optometrist. He told Nobel he wanted an investment that would supplement his retirement, at a moderate level of risk.

25.   On or about June 3, 2016, at Nobel's Austin office and at McCormick's office and home, Horter, acting through Noble, falsely represented to McCormick that FIP was safe and satisfied those investment objectives. Horter, acting through Noble, falsely represented and recommended that FIP was a good investment for McCormick to buy, but this investment was in fact

unsuitable for McCormick in light of his investment objectives and knowledge and financial situation and needs.

**H.** **The Puthoffs**

26.     B. Puthoff is more than 70 years old and is a retired factory worker. N. Puthoff was more than 70 years old at the time of his 1st Global investment at issue, and he passed away in 2019. He was a factory worker before retiring on disability in 1999 when he broke his back in an accident. He had multiple sclerosis, underwent heart surgery, and suffered from chronic obstructive pulmonary disease (COPD). The Puthoffs told Wendel they wanted low-risk investments for their retirement.

27.     On or about October 25, 2016, at the Puthoffs' home and at Wendel's Fort Recovery office, Horter, acting through Wendel, falsely represented to the Puthoffs that 1st Global satisfied those investment objectives. Horter, acting through Wendel, falsely represented and recommended that 1st Global was a good investment for the Puthoffs to buy, but this investment was in fact unsuitable for the Puthoffs in light of their investment objectives and knowledge and financial situation and needs.

**HORTER'S DUTY TO SUPERVISE**

28.     Horter is a registered investment adviser with the Securities and Exchange Commission, the Ohio Division of Securities, and the Texas State Securities Board. Wendel was registered with the Ohio Division of Securities and Noble was registered with the Texas Securities Board as investment adviser representatives of Horter.

29.     Under federal, Ohio, and Texas statutory and common law, Horter, as a registered investment adviser, had a duty to supervise Wendel and Noble to prevent violations of the law.

Under federal law, Horter was required "reasonably to supervise, with a view to preventing violations of"

> any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, [the Investment Company Act of 1940], [the Investment Advisers Act of 1940)], the Commodity Exchange Act, the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board, . . . another person who commits such a violation, if such other person is subject to his supervision. For the purposes of this paragraph no person shall be deemed to have failed reasonably to supervise any person, if–
>
> (A) there have been established procedures, and a system for applying such procedures, which would reasonably be expected to prevent and detect, insofar as practicable, any such violation by such other person, and
>
> (B) such person has reasonably discharged the duties and obligations incumbent upon him by reason of such procedures and system without reasonable cause to believe that such procedures and system were not being complied with.

15 U.S.C. § 80b-3(e)(6).

30.    Ohio law likewise requires supervision.

(D) Duty of reasonable supervision. Every investment adviser licensed by the division shall reasonably supervise its investment adviser representatives and other persons, employed by or associated with, the investment adviser with a view toward preventing violations of Chapter 1707. of the Revised Code, the Commodity Exchange Act, 49 Stat 1491, 7 U.S.C. 1, as amended, the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated under those statutes. For purposes of this paragraph, no investment adviser licensed by the division shall be deemed to have failed to satisfy its duty of reasonable supervision if:

(1) The investment adviser has established procedures, and a system for applying the procedures, that would reasonably be expected to prevent and detect, insofar as practicable, any violation by its investment adviser representatives or other persons, employed by or associated with, the investment adviser; and

(2) The investment adviser has reasonably discharged the duties and obligations incumbent on the investment adviser by reason of the established procedures and the system for applying the procedures without reasonable cause to believe that there was not compliance with the procedures and systems.

O.A.C. 1301:6-3-15.1(D).

31.    Texas law similarly provides:

11

> Each registered investment adviser shall establish, maintain, and enforce a system to supervise the activities of its investment adviser representatives that is reasonably designed to achieve compliance with the Texas Securities Act, Board rules, and all applicable securities laws and regulations. Supervisory systems must be written and available for inspection in either print or electronic format.

7 Tex. Admin. Code § 116.10

32.     Horter violated its duty under federal and state statutory and common law reasonably to supervise Wendel and Noble.

## PLAINTIFFS' ARBITRATION AGREEMENTS WITH HORTER

33.     Each of the Plaintiffs entered into client agreements with Horter, which provided as follows for arbitration in Cincinnati, Ohio, in accordance with the rules of the American Arbitration Association ("AAA"):

> Client and Advisor both agree that all controversies which may arise between them concerning any transaction or construction, performance or breach of this agreement that cannot be settled, be submitted to binding arbitration in accordance with the rules, then in effect, of the American Arbitration Association. Client and Advisor agree that any such arbitration would be venued in Cincinnati, Ohio. All awards rendered by the arbitrators shall be final and judgement upon award may be entered in any court of competent jurisdiction. This Agreement is not intended to limit any right the Client may have under any provision of state and federal securities laws.

See Exh. 1, which includes Horter client agreements for each Plaintiff. The arbitration provision is in paragraph 14 of these agreements.

34.     Each client agreement between Horter and the Plaintiffs provided that it "shall be construed and interpreted in accordance with the substantive laws of the State of Ohio." See paragraph 15 of the client agreements included in Exh. 1.

35.     Each client agreement between Horter and the Plaintiffs also provided that

the terms and provisions of this Agreement be construed to be separate and severable. If any term or provision of this Agreement shall be held void, invalid, unenforceable

12

or in conflict with any applicable law, all of the other terms and provisions of this Agreement shall remain valid and fully enforceable.

<u>See</u> paragraph 17 of the client agreements included in Exh. 1.

## **PLAINTIFFS' EFFORTS TO ARBITRATE WITH HORTER**

36.     Pursuant to their client agreements, Plaintiffs Allen and B. Puthoff, individually and on behalf of the Estate of N. Puthoff, on November 15, 2019, filed a Statement of Claim with the AAA, alleging that Horter, through Wendel, by selling the fraudulent and unregistered 1st Global investments to Allen and the Puthoffs, was liable to them for:

I.      Violations of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15(b);
II.     Violations of the federal securities laws, 15 U.S.C. §§ 77l(1), 77o; 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;
III.    Violations of the Ohio securities laws, R.C. 1707.41 and 1707.43;
IV.     Breach of contract;
V.      Common law fraud;
VI.     Breach of fiduciary duty; and
VII.    Negligence and gross negligence.

<u>See</u> Exh. 6, which includes Allen's and B. Puthoff's AAA Statement of Claim.

37.     Pursuant to his client agreement, Plaintiff Engle on November 20, 2019, filed a Statement of Claim with the AAA, alleging that Horter, through Wendel, by selling the fraudulent and unregistered Woodbridge, 1st Global, and Wendel Alternative Fund investments to Engle, by recommending and selling high risk investments to Engle, and by charging excessive fees, was liable to Engle for:

I.      Violations of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15(b);
II.     Violations of the federal securities laws, 15 U.S.C. §§ 77l(1), 77o; 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

III.    Violations of the Ohio securities laws, R.C. 1707.41 and 1707.43;
IV.    Breach of contract;
V.    Common law fraud;
VI.    Breach of fiduciary duty; and
VII.    Negligence and gross negligence.

<u>See</u> Exh. 7, which includes Engle's AAA Statement of Claim.

38.    Pursuant to his client agreement, Plaintiff McCormick on November 27, 2019, filed a Statement of Claim with the AAA, alleging that Horter, through Wendel, by selling the fraudulent and unregistered FIP investment to McCormick, was liable to McCormick for:

I.    Violations of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15(b);
II.    Violations of the federal securities laws, 15 U.S.C. §§ 77l(1), 77o; 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;
III.    Violations of the Texas securities laws, Tex. Rev. Civ. Stat. Ann. art. 581-7, 581-33;
IV.    Violations of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code, § 17.41, *et seq.*;
V.    Breach of contract;
VI.    Common law fraud;
VII.    Breach of fiduciary duty; and
VIII.    Negligence and gross negligence.

<u>See</u> Exh. 8, which includes McCormick's AAA Statement of Claim.

39.    Each Plaintiff also filed a Demand for Arbitration and sent copies of their AAA Statement of Claim and their Demand for Arbitration to Horter. Exh. 9 and 10.

40.    Although the parties agreed to arbitrate in accordance with the AAA's rules, Horter's past actions caused the AAA not to administer the Plaintiffs' arbitration claim against Horter. On December 4, 2019, for B. Puthoff, Allen, and Engle and on December 13, 2019, for McCormick, the AAA said that, "[p]rior to the filing of this arbitration, Horter Investment Management, LLC failed to comply with the AAA's policies regarding consumer claims." The AAA therefore "decline[d] to

14

administer" Plaintiffs' arbitration claim against Horter "and any other claims between Horter Investment Management, LLC and its consumers." Exh. 11.

41. The AAA, however, stated that Horter could start the arbitration process if it agreed to comply with AAA rules.

> If Horter Investment Management, LLC advises the AAA in the future of its intention to comply with the AAA's Consumer Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its sole discretion, accepting newly filed consumer cases going forward. Therefore, if the business wishes for the AAA to consider accepting consumer disputes going forward, the business must, at a minimum, register its clause on the Consumer Clause Registry on our website, www.adr.org/clauseregistry. Upon completion of the registration process and confirmation from the AAA that the business is now active on the Consumer Clause Registry, the business is responsible for informing all parties that Claimant may re-file their claim.

Exh. 11.

42. On December 18, 2019, Plaintiffs sent letters to Horter's counsel offering for each Plaintiff to arbitrate in Cincinnati and requesting Horter to state whether it agreed or did not agree to arbitrate with Plaintiffs before the AAA in accordance with AAA rules. Exh. 12. Plaintiffs did not receive a response from Horter to this offer, which removed one of Horter's principal objections to arbitration.

43. On December 23, 2019, the AAA said regarding each of the Plaintiffs' arbitration demands that the AAA would "comply with a court order compelling arbitration or the business/respondent can register their clause with the American Arbitration Association's Consumer Clause Registry." Exh. 13. In another similar case, Kirk v. Horter Investment Management, LLC, AAA Case Number: 01-18-0004-1614, after a Colorado state court issued an order compelling arbitration, the AAA is now administering an arbitration claim against Horter, even though the

arbitration agreement in that case also provided for arbitration in Cincinnati. Exh. 14. An arbitrator has been selected in the Kirk case through AAA procedures, and this arbitration is currently scheduled to take place in Cincinnati in 2020. As stated by the AAA, Exh. 13 and 14, if this Court enters an order requiring arbitration, the AAA will administer the arbitration even if Horter does not register its arbitration clause with the AAA, just as the AAA is currently administering the Kirk arbitration.

44.     On December 27, 2019, Plaintiffs proposed to Horter that it agree to a stipulated order compelling arbitration. Exh. 15. This proposal would remove Horter's other objections to arbitrating before the AAA, because Horter would not have to register its arbitration clause with the AAA. Horter, however, did not respond to this proposal. Horter in fact has yet to make any response of any kind relating to the Plaintiffs' demands for arbitration.

## COUNT I

## <u>VIOLATIONS OF THE INVESTMENT ADVISERS ACT</u>

45.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 44 above, as if fully contained herein.

46.     For compensation, Horter engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or, as part of a regular business, issued or promulgated analyses or reports concerning securities. Pursuant to Section 202(a)(11) of the Investment Advisers Act of 1940 ("Investment Advisers Act"), 15 U.S.C. 80b-2(a)(11), Horter was an investment adviser. Wendel and Noble were investment adviser representatives for Horter.

47.     Horter, through its investment adviser representatives Wendel and Noble, was an investment adviser for Plaintiffs and functioned as an investment adviser in connection with the investment transactions alleged herein. Plaintiffs had investment adviser agreements with Horter and paid compensation to Horter for investment advice.

48.     Horter, through its investment adviser representatives Wendel and Noble, by engaging in the conduct alleged herein, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly employed devices, schemes, or artifices to defraud Plaintiffs, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon Plaintiffs, and engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative, in violation of Section 206 of the Investment Advisers Act, 15 U.S.C. 80b-6. Horter also did not reasonably supervise Wendel and Noble, in violation of Section 203 of the Investment Advisers Act, 15 U.S.C. 80b-3(e)(6).

49.     As a result of Horter's, Wendel's, and Noble's violations of the Investment Advisers Act in connection with the transactions alleged herein, Plaintiffs' investment adviser agreements with Horter are void, pursuant to Section 215(b) of the Investment Advisers Act, 15 U.S.C. 80b-15(b).

50.     Plaintiffs request rescission of their investment advisor contracts with Horter and restitution of the consideration paid under such contracts.

## COUNT II

## <u>VIOLATIONS OF FEDERAL SECURITIES LAWS</u>

51.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 50 above, as if fully contained herein.

52.     The Woodbridge, 1st Global, Wendel Alternative Fund, and FIP investments sold to Plaintiffs were securities as defined in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

53.     Under Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, Horter was a controlling person over the conduct alleged herein, because Horter actually exercised control over the operations of Wendel and Noble in general and possessed the power to control the specific transactions in Woodbridge, 1st Global, Wendel Alternative Fund, and FIP at issue.

### A.     <u>Offer and Sale of Unregistered Securities</u>

54.     Horter, by engaging in the conduct alleged herein, directly, indirectly, or through persons that it controlled, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, offered to sell or sold securities, or, directly or indirectly, carried or caused such securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale.

55.     No registration statement was filed with the Securities and Exchange Commission or was in effect with respect to the securities during their offering of the securities sold to Plaintiffs.

56.     By reason of the foregoing, Horter directly, indirectly, or through persons it controlled, violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and is subject to liability under Sections 12(1) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(1), 77o.

**B.     Fraud in Offer or Sale of Securities**

57.     Horter, by engaging in the conduct alleged herein, directly, indirectly, or through persons it controlled, offered to sell or sold securities, by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, and by means of a prospectus or oral communication which included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

58.     By reason of the foregoing, Horter directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 12(2) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(2), 77o.

**C.     Fraud in Connection With the Purchase or Sale of Securities**

59.     Horter, by engaging in the conduct alleged herein, directly, indirectly, or through persons it controlled, in connection with the purchase or sale of a security, by use of means or instrumentalities of interstate commerce, or of the mails, with *scienter*:

a.     Employed devices, schemes, or artifices to defraud;

b.     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

60.     By reason of the foregoing, Horter directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 10(b) and 20 of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

61.     Plaintiffs request statutory damages provided in Sections 12(2) of the Securities Act, 15 U.S.C. §§ 77*l*(2), and compensatory damages and costs.

## COUNT III

## <u>VIOLATIONS OF OHIO SECURITIES ACT</u><br>(<u>for Plaintiffs Allen, Engle, and the Puthoffs</u>)

62.     Plaintiffs Allen, Engle, and the Puthoffs reallege, reaffirm and reincorporate paragraphs 1 through 61 above, as if fully contained herein.

### A.     <u>Failure to Register Woodbridge, 1st Global, and Wendel Alternative Fund in Ohio</u>

63.     R.C. 1707.09 and 1707.44(C)(1) state that offering or selling any security in Ohio is unlawful unless the security is registered.

64.     R.C. 1707.43(A) states that every sale made in violation of R.C. Chapter 1707 may be voided at the election of the purchaser. The purchaser is entitled to recover the consideration paid for the security and all costs associated with the proceeding.

65.     Given Woodbridge's, 1st Global's, and Wendel Alternative Fund's lack of registration in Ohio, Plaintiffs Allen, Engle, and the Puthoffs are entitled to the full amount paid for their investments plus all taxable court costs.

**B.** **Unsuitable Recommendations, Misrepresentations, and Omissions of Material Fact**

66. As alleged herein, Horter, acting through Wendel, knowingly made or caused to be made false representations concerning material and relevant facts, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made not misleading, and knowingly engaged in acts or practices that were illegal, fraudulent, or prohibited, in violation of R.C. 1707.44(B)(4), 1707.44(G), and 1707.44(M)(3).

67. Horter, acting through Wendel, made numerous false and misleading statements to Plaintiffs Allen, Engle, and the Puthoffs concerning Woodbridge, 1st Global, and Wendel Alternative Fund and failed to disclose numerous material facts to Plaintiffs Allen, Engle, and the Puthoffs concerning Woodbridge, 1st Global, and Wendel Alternative Fund, all as more fully stated above.

68. Horter is liable under the doctrine of respondeat superior for Wendel's violations of the Ohio Securities Act. Horter is also liable under R.C. 1707.43(A), which states that every person who participates or aids in the sale in any way is also liable jointly and severally with the seller.

69. Pursuant to R.C. 1707.43(A), Plaintiffs Allen, Engle, and the Puthoffs are entitled to recover the consideration paid for their investments and all costs.

**COUNT IV**

**VIOLATIONS OF TEXAS SECURITIES ACT**
**(for Plaintiff McCormick)**

70. Plaintiff McCormick realleges, reaffirms, and reincorporates paragraphs 1 through 69 above, as if fully contained herein.

A.      **Failure to Register FIP in Texas**

71.     Tex. Rev. Civ. Stat. Ann. art. 581-7 of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-1, *et seq.*, states that offering or selling a security in Texas is unlawful unless the security is registered.

72.     Tex. Rev. Stat. Ann. art. 581-33(A)(1) of the Texas Securities Act states that every person who offers or sells securities in violation of art. 581-7 is liable to the person buying the security for rescission or for damages if the buyer no longer owns the security. Pursuant to such rescission, a buyer shall recover the consideration he paid for the security plus interest thereon at the legal rate, less the amount of any income received on the security, upon tender of the security.

73.     Given FIP's lack of registration in Texas, McCormick is entitled to rescission of his FIP investment as well as legal interest and attorney's fees.

B.      **Unsuitable Recommendations, Misrepresentations, and Omissions of Material Fact**

74.     As alleged herein, Horter, acting through Noble, committed fraud, engaged in fraudulent practices in rendering services as a investment adviser, and offered or sold securities through untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, while rendering services as an investment advisor, in violation of Art. 581-33(A)(2) and 581-33.1 of the Texas Securities Act.

75.     Horter, acting through Noble, made numerous false and misleading statements to Plaintiff McCormick concerning FIP and failed to disclose numerous material facts to Plaintiff McCormick concerning FIP, all as more fully stated above.

76.     Horter is liable under the doctrine of respondeat superior for Noble's violations of the Texas Securities Act. In addition, Horter is liable under art. 581-33(F)(1) and 581-33.1(E) of the Texas Securities Act as a control person over Noble's activities.

77.     Pursuant to Art. 581-33 and 581-33.1 of the Texas Securities Act, McCormick is entitled to rescission of his investment as well as legal interest and attorney's fees, damages for his losses, and recovery of investment adviser fees paid.

### COUNT V

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT
(for Plaintiff McCormick)

78.     Plaintiff McCormick realleges, reaffirms, and reincorporates paragraphs 1 through 77 above as if fully contained herein.

79.     Horter, acting through Noble, provided services to McCormick that included "false, misleading, or deceptive acts or practices," in violation of Section 17.46(a) of the Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code, § 17.41 *et seq.* ("DTPA"). Acting through Noble, Horter violated the following specific DTPA provisions in section 17.46(b), among others:

> (5)     representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . .;

> (7)     representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

> (24)     failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the customer into a transaction into which the consumer would not have entered had the information been disclosed.

80.     McCormick is entitled to relief for damages under section 17.50(b)(1) of the DTPA and to attorneys' fees under section 17.50(d) of the DTPA.

## COUNT VI

## **BREACH OF CONTRACT**

81.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 80 above, as if fully contained herein.

82.     Plaintiffs entered into investment adviser agreements with Horter as authorized by state and federal law. Exh. 1. Contracts made pursuant to statutes are construed in Ohio and Texas as though the statutes are incorporated into the contract and become implied terms and conditions of any contract or contractual right. The investment adviser agreements further provided that they "shall be construed and interpreted in accordance with the substantive laws of the State of Ohio." Exh. 1.

83.     Pursuant to O.A.C. 1301:6-3-16.1(A) and 7 Tex. Admin. Code § 116.2(a)(1)(B), Wendel filed a Form U4 with the Ohio Division of Securities and Noble filed a Form U4 with the Texas State Securities Board, signed by Horter, in which they agreed to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the States of Ohio and Texas. Exh. 16. Plaintiffs are intended third-party beneficiaries of this agreement.

84.     Plaintiffs have complied with their contractual obligations to Horter.

85.     As alleged herein, Horter, acting through Wendel and Noble, violated federal and state statutory and common law, both directly as a result of Wendel's and Noble's actions and because Horter did not reasonably supervise Wendel and Noble. These violations constituted

24

violations of Plaintiffs' investor adviser agreements directly with Horter and violations of Wendel's and Noble's Form U4 agreements with the States of Ohio and Texas, for which Plaintiffs are third-party beneficiaries.

86.     Horter, acting through Wendel and Noble and by failing reasonably to supervise them, also breached the duty of good faith and fair dealing, which is inherent in every contract.

87.     Plaintiffs have suffered damages as a result of these violations. They request an award of their damages, costs, interest, and such other relief as is deemed proper and necessary.

## COUNT VII

## COMMON LAW FRAUD

88.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 87 above, as if fully contained herein.

89.     As alleged herein, Horter, acting through Wendel and Noble, had duties to disclose, because they were fiduciaries and because their other representations were inaccurate, incomplete, and misleading.

90.     As alleged herein, Horter, acting through Wendel and Noble, made representations to the Plaintiffs and concealed facts from the Plaintiffs which were material to the transactions at issue. These representations and concealments were made falsely, with knowledge of their falsity, or with utter disregard and recklessness as to whether they were true or false. Horter, acting through Wendel and Noble, intended to mislead the Plaintiffs into relying on these representations and concealments. Plaintiffs justifiably relied on these representations and concealments and suffered injuries that were proximately caused by their reliance.

25

91. Plaintiffs request an award of their damages, costs, interest, and such other relief as is deemed proper or necessary.

## COUNT VIII

## **BREACH OF FIDUCIARY DUTY**

92. Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 91, as if fully contained herein.

93. Horter was an investment adviser, and Wendel and Noble were investment adviser representatives. They were therefore Plaintiffs' fiduciaries under state and federal law.

> Investment advisers and IARs [investment adviser representatives] stand in a fiduciary relationship with their clients. This duty is a long-standing doctrine of both federal and state common law, and is reiterated in the Ohio Administrative Code. As fiduciaries, advisers have "an affirmative duty of utmost good faith and full and fair disclosure of all material facts." (See Transamerica Mortg. Adv. Inc. v. Lewis, 444 U.S. 11, 17 (1979)). In addition, an adviser has the duty to act in the best interest of their clients and to disclose all material information about actual or potential conflicts of interest. Specifically, an adviser or IAR has a duty to:
> • employ reasonable care to avoid misleading clients,
> • have a reasonable independent basis for investment advice,
> • ensure that investment advice is suitable, and
> • obtain "best execution" of client transactions.

Exh. 17.

94. Plaintiffs had a special fiduciary relationship of trust and confidence with Horter, Wendel, and Noble, because Horter was their investment adviser, because Wendel and Noble were their investment adviser representatives, because Horter, Wendel, and Noble possessed superior knowledge, judgment, skill, and experience in the securities market in contrast to Plaintiffs' lack of meaningful knowledge and understanding, and because Horter, Wendel, and Noble had greater

access to information concerning investments and securities laws. Plaintiffs came to Horter, Wendel, and Noble and relied on them for these reasons.

95.     Pursuant to O.A.C. 1301:6-3-44(E)(1)(f), investment advisers and investment adviser representatives are prohibited from engaging, or attempting to engage, in any act or practice constituting a breach of fiduciary duty.

96.     Because of this fiduciary relationship between Plaintiffs, Horter, Wendel, and Noble, Plaintiffs reasonably relied to their detriment on Horter's, Wendel's, and Noble's superior knowledge, skill, judgment, and experience in handling their monies.

97.     As alleged herein, Horter, acting through Wendel and Noble, breached their fiduciary duty to Plaintiffs by making material misrepresentations, failing to conduct a proper due diligence investigation, failing to make material disclosures, recommending investments in fraudulent securities in disregard for Plaintiffs' best interests, and failing to ensure compliance with all applicable federal and state statutes and rules, including those relating to misrepresentations and omissions in the sale of securities and registration. Horter also breached its fiduciary duty by failing reasonably to supervise Wendel and Noble.

98.     Plaintiffs have suffered damages as a result of Horter's, Wendel's, and Noble's breaches of their fiduciary duty.

99.     Plaintiffs request an award of their damages, costs, interest, and such other relief as is deemed proper or necessary.

## COUNT IX

## NEGLIGENCE

100.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 99 above, as if fully contained herein.

101.     Horter is liable to the Plaintiffs for negligence. Horter, acting through Wendel and Noble, by virtue of their positions as Plaintiffs' investment adviser and investment adviser representatives, owed Plaintiffs a duty of due care to provide proper investment advice. As alleged herein, Horter, acting through Wendel and Noble, breached this duty, and this breach proximately caused the Plaintiffs to suffer damages.

102.     Horter is liable to the Plaintiffs for negligent misrepresentation. As alleged herein, Horter, acting through Wendel and Noble, in the course of their business, profession, and employment, supplied false information for the guidance of the Plaintiffs. Horter, acting through Wendel and Noble, failed to exercise reasonable care in obtaining or communicating this information to the Plaintiffs. The Plaintiffs suffered pecuniary losses caused by their justifiable reliance on this information.

103.     Horter is liable to the Plaintiffs for negligent supervision. Wendel and Noble were investment adviser representatives of Horter. As alleged herein, they acted incompetently. Horter had a duty to supervise Wendel and Noble and therefore knew or should have known of their incompetent behavior. Wendel's and Noble's acts and omissions caused injuries to the Plaintiffs, and Horter's negligence in supervising Wendel and Noble proximately caused injuries to Plaintiffs.

104.     Plaintiffs request an award of their damages, costs, interest, and such other relief as is deemed proper or necessary.

28

**COUNT X**

**STAY PENDING ARBITRATION**

105.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 104 above, as if fully contained herein.

106.     Pursuant to R.C. 2711.02, 9 U.S.C. § 3, and Tex. Civ. Prac. & Rem. Code § 171.025, Plaintiffs ask that their claims against Horter in Counts I through IX above be stayed, pending arbitration administered as the parties agreed by the AAA under AAA rules. The Court should retain jurisdiction to confirm any arbitration award.

**COUNT XI**

**ORDER COMPELLING ARBITRATION**

107.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 106 above, as if fully contained herein.

108.     Pursuant to R.C. 2711.03, 9 U.S.C. § 4, and Tex. Civ. Prac & Rem. Code § 171.021, Plaintiffs request that Horter be required to arbitrate the Plaintiffs' claims against Horter contained in Counts I through IX above, in an arbitration administered as the parties agreed by the AAA under AAA rules.

**COUNT XII**

**DECLARATORY RELIEF THAT THE PARTIES ARE REQUIRED TO ARBITRATE**

109.     Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 108 above, as if fully contained herein.

110.     Alternatively, pursuant to R.C. 2721.02, 22 U.S.C. § 2201, and Tex. Civ. Prac. & Rem. Code § 37.004(a)., Plaintiffs ask for declaratory relief that Horter is required to arbitrate the

Plaintiffs' claims against Horter contained in Counts I through IX above, in an arbitration administered as the parties agreed by the AAA under AAA rules.

## COUNT XIII

## BREACH OF CONTRACT TO ARBITRATE

111.    Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 110 above, as if fully contained herein.

112.    Alternatively, Plaintiffs ask the Court to find that Horter has breached its contracts to arbitrate with the Plaintiffs. Horter's actions frustrated the purpose of Plaintiffs' arbitration agreements with Horter and caused the AAA to decline to administer the Plaintiffs' arbitration. When a party to a contract creates a situation whereby it cannot fulfill its obligations under the contract, the party breaches the contract by frustrating its purpose.

113.    Plaintiffs request the remedy of specific performance and ask for an order requiring Horter to honor its contractual obligation to arbitrate the Plaintiffs' claims against Horter contained in Counts I through IX above, in an arbitration administered as the parties agreed by the AAA under AAA rules.

## COUNT XIV

## APPOINTMENT OF ARBITRATORS

114.    Plaintiffs reallege, reaffirm, and reincorporate paragraphs 1 through 113 above, as if fully contained herein.

115.    As a lesser alternative, pursuant to R.C. 2711.04, 9 U.S.C. § 5, and Tex. Civ. Prac. & Rem. Code § 171.041, Plaintiffs ask the Court to appoint arbitrators to resolve the parties' disputes.

WHEREFORE, Plaintiffs respectfully request the following relief:

a.     Pursuant to R.C. 2711.02, 9 U.S.C. § 3, and Tex. Civ. Prac. & Rem. Code § 171.025, a stay of this matter pending arbitration between Horter and the Plaintiffs before the AAA under AAA rules;

b.     Pursuant to R.C. 2711.03, 9 U.S.C. § 4, and Tex. Civ. Prac. & Rem. Code § 171.021, an order requiring Horter to arbitrate with the Plaintiffs before the AAA under AAA rules;

c.     Alternatively, pursuant to R.C. 2721.02, 22 U.S.C. § 2201, and Tex. Civ. Prac. & Rem. Code § 37.004(a), declaratory relief that Horter must arbitrate with Plaintiffs before the AAA under AAA rules;

d.     Alternatively, a finding that Horter breached its contracts with the Plaintiffs by not complying with AAA rules. Plaintiffs ask for specific performance and ask this Court to order Horter to comply with these contracts and arbitrate with Plaintiffs before the AAA under AAA rules;

e.     Alternatively, pursuant to R.C. 2711.04, 9 U.S.C. § 5, and Tex. Civ. Prac. & Rem. Code § 171.041, appointment of arbitrators to resolve the parties' disputes.

f.     If this Court does not grant any of the foregoing relief contained in paragraphs (a) through (e), Plaintiffs ask that this litigation proceed in this Court before a jury on Counts I through IX above..

g.      Such other and further relief as the Court deems appropriate.

Dated: January 6, 2020                  Respectfully submitted,

/s/ Marnie C. Lambert               /s/ Kalju Nekvasil

Marnie C. Lambert, Esq.            Kalju Nekvasil, Esq.
Ohio Bar No. 0073054              Florida Bar No. 0866946
Lambert Law Firm, LLC            Goodman & Nekvasil, P.A.
4889 Sawmill Road, Suite 125      624 1st Ave. S.
Columbus, Ohio 43235            St. Petersburg, FL 33701
Telephone:    614-504-8803       Telephone:   727-524-8486
Facsimile:    888-386-3098       Facsimile:   727-524-8786
mlambert@mclinvestlaw.com      gnmain@gnfirm.com
Trial counsel for Plaintiffs          Pro Hac Vice Admission requested